**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **ESTER AGUERO,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 3:18-CV-3342-BH** |
| | § | |
| **ANDREW M. SAUL,** | § | |
| **COMMISSIONER OF THE SOCIAL** | § | |
| **SECURITY ADMINISTRATION,** | § | |
| | § | |
| **Defendant.** | § | **Consent Case[1]** |

## MEMORANDUM OPINION AND ORDER

Based on the relevant findings, evidence, and applicable law, the Commissioner's decision

is **REVERSED**, and the case is **REMANDED** to the Commissioner for further proceedings**.**

## I. BACKGROUND

Ester Aguero (Plaintiff) seeks judicial review of the final decision of the Commissioner of

the Social Security Administration (Commissioner) denying her claim for a period of disability and

disability insurance benefits (DIB) under Title II of the Social Security Act (Act), and for

supplemental security income (SSI) under Title XVI of the Act. (doc. 2.)

### A.    Procedural History

On August 12, 2015, Plaintiff filed her application for SSI and DIB, alleging disability

beginning on June 10, 2014. (doc. 15-1 at 256-61.)[2] Her claim was denied initially on November

5, 2015, and upon reconsideration on April 21, 2016. (*Id.* at 115-120, 129-34.) On June 15, 2016,

---

[1] By consent of the parties and the order of transfer dated February 22, 2019 (doc. 16), this case has been transferred for the conduct of all further proceedings and the entry of judgment.

[2] Citations to the record refer to the CM/ECF system page number at the top of each page rather than the page numbers at the bottom of each filing.

Plaintiff requested a hearing before an Administrative Law Judge (ALJ). (*Id.* at 187-88.) She and a vocational expert (VE) appeared and testified at a hearing on May 10, 2017 before the ALJ. (*Id.* at 33-33.) She and a second VE appeared and testified at a supplemental hearing with the ALJ on November 7, 2017. (*Id.* at 45-68.) On January 12, 2018, the ALJ issued a decision finding her not disabled and denying her claims for benefits. (*Id.* at 19-27.)

Plaintiff appealed the ALJ's decision to the Appeals Council on February 20, 2018. (*Id.* at 8.) It denied her request for review on August 10, 2018, making the ALJ's decision the final decision of the Commissioner. (*Id.* at 5-10.) Plaintiff timely appealed the Commissioner's decision under 42 U.S.C. § 405(g). (*See* doc. 2.)

## B.    Factual History

### 1.    Age, Education, and Work Experience

Plaintiff was born on December 9, 1959, and was 47 years old at the time of the initial hearing. (doc. 15-1 at 48.) She had a GED and had work experience as an assembler and house keeper. (*Id.* at 48-49.)

### 2.    Medical Evidence

From April 2014 through June 2014, Plaintiff presented to Parkland Hatcher Station Health Center (Parkland) for head/neck pain, headaches, dysuria, increased frequency in urination, and pain in the right quad that radiated to her groin, which she rated as a ten on a ten-point scale. (*Id.* at 548, 553-54.) She had a pinkish discharge, blood in her urine, incomplete voiding and right-sided pelvic pain. (*Id.* at 549-50, 569.) Her conditions included tobacco use disorder, allergic rhinitis, hyperglycemia, and pelvic pain. (*Id.* at 550, 563.) A CT scan of her abdomen/pelvis with IV contrast revealed there were a few punctate renal stones with bilateral mild dydronephrosis, a 1 cm cyst

within the upper pole of the right kidney posteriorly, multiple pelvic phileboliths bilaterally, and degenerative changes. (*Id.* at 561.) Plaintiff was assessed with pelvic pain and impaired glucose tolerance and referred to a dietician and to Lake West Women's Health Center for her pain and a urine culture. (*Id.* at 441-442.)

In January 2015, Plaintiff presented to Parkland for right knee pain, headaches, swelling in her right hand, and frequent urination. (*Id.* at 573.) She complained that she had morning stiffness in her right hand, her right knee popped out when she tried to stand from a seated position, and she used the restroom approximately 20-25 times per day. (*Id.* at 574.) Plaintiff's x-ray of her right knee revealed minimal "tricompartmental DJD with marginal osteophyte formation of the patella." (*Id.* at 582.) Plaintiff was referred for a CT scan of her brain an MRI of her knee, and also to a nutritionist for weight loss. (*Id.* at 441.)

In February 2015, Plaintiff presented to Parkland for a CT of her brain without IV contrast, which revealed a 14mm transverse by 13mm AP x 14 mm cranicocaudal lesion within the sella turcica. (*Id.* At 588.) A second CT scan revealed a seller mass that measured 1.2 cm anterior-posterior x 1.7 cm transverse by 1.6 cm craniocaudal. (*Id.* at 594.) Plaintiff also complained of urinary leakage, a sensation of incomplete emptying, and blood in her urine. (*Id.* at 437, 599.) She was referred to neurosurgery for her abnormal CT scan and to a Uro-GYN for her feelings of incomplete emptying, and was prescribed Bactrim DS and encouraged to perform Kegel exercises. (*Id.* at 438.)

From March 2015 through July 2015, Plaintiff sought treatment for headaches and a pituitary mass. (*Id.* at 434-36, 474-75.) Her MRI revealed an intraseller left-sided nonenhancing mass with bone remodeling and subtle bone erosion extending to the posterior aspect of the sphenoid sinus. (*Id.*

at 432.) She also continued to experience headaches, blurred vision, and urinary leakage, for which she wore two to three pantiliners a day. (*Id.* at 415-17.) She was prescribed Imitrex, and surgical intervention was recommended given the presence of a growth hormone and secreting macroademona. (*Id.* at 429,436.) Plaintiff's surgery was planned for June 30, 2015, but was cancelled and rescheduled for September 2015. (*Id.*)

In September 2015, Plaintiff presented to Parkland for an endoscopic transphernoidal resection of the pituitary adenoma. (*Id.* at 72-22.) Her follow up visit noted that she was doing well after surgery but had ongoing dizziness and increased thirst. (*Id.* at 727.) She experienced lightheadedness mostly when she extended her neck, no longer had severe headaches, but had some facial numbness and pain that was a six on a ten-point scale. (*Id.* at 727. ) She was restricted from driving and prescribed Meclizien, which she reported helped her feel stable while taking it. (*See id.* at 727-28, 888.)

In October 2015, Plaintiff presented to Parkland for a follow up for her acromegaly and pituitary macroadenoma resection. (*Id.* at 743.) Plaintiff reported that she no longer urinated frequently at night and could "hold the DDAVP." (*Id.* at 746.) Her physician's recommendations were to follow up with neurosurgery, repeat the MRI, follow up with ophthalmology, and decrease use of hydrocortisone. (*Id.* at 745-46.)

On December 17, 2015, Plaintiff met with Dr. Fiona Claire Esfandiari, M.D., complaining of hypernatremia; she claimed it caused her to be very thirsty and experience an increase in urinary frequency. (*Id*. at 769.) She reported taking Ditropan, which was helping because "even when she [felt] the need to go to the bathroom she [did] not leak," but was still urinating eight to ten times during the day and three to four times at night. (*Id*.) She was diagnosed with mixed urinary

incontinence. (*Id.* at 770.) At her follow up visit on January 6, 2016, she reported hand neuropathy, nasal congestion, anxiety/panic attacks, increased puffiness, intermittent mild headaches, and some increased urination that improved after a "short course of ddAVP." (*Id.* at 772-76.) The doctor noted that Plaintiff was doing well four months post surgery. (*Id.* at 778.) She was to maintain her scheduled follow up with the Endocrine clinic and to return in three months. (*Id.*)

From October 2016 to November 2016, Plaintiff sought treatment at Parkland for her knee pain and headaches. (*Id.* at 837-858.) Since her surgery, she noted only occasional right-sided headaches and some concentration/memory difficulties, but otherwise had no specific complaints. (*Id.* at 850-51.) The doctor noted that Plaintiff was symptomatically doing well and had frequent headaches that were not related to her pituitary tumor. (*Id.* at 851.) She was assessed with nonintractable headaches, unspecified chronicity pattern, and primary central diabetes insipidus. (*Id.* at 840.) Plaintiff was directed to continue to use her knee brace, continue her current medication, and keep her appointment with neurosurgery. (*Id.*) She was prescribed Midrin for her headaches and was to return for an MRI of her brain within one year. (*See id.* at 851.)

On May 23, 2017, Plaintiff presented to Parkland for emesis and headaches. (*Id.* at 887.) She reported her prior pituitary adenoma resection and that she had not taken her medications for six months or followed up with "endo clinic due to losing coverage" and being unable to afford her medication. (*Id.* at 887-88.) She was assessed with nonintractable headaches, primary central diabetes insipidus, allergic rhinitis, referred for a head MRI, and prescribed Notriptyline and Imitrex. (*Id.* at 889-90.) Plaintiff was counseled about possible drug interactions with Prozac, her colonoscopy was rescheduled, and she was scheduled to complete fasted labs. (*Id.* at 889.) In June 2017, her MRI revealed "two small hypoenhancing nodules within the sellar floor" most compatible

with residual disease, and she was to follow up with her clinical team. (*Id.* at 912-913.)

In October 2017, Plaintiff presented to Parkland for shoulder pain, foot pain and headaches. (*Id.* at 930-46.) She was directed to soak her feet in vinegar and water at home and was referred to podiatry. An x-ray of her right shoulder revealed mild degenerative changes and diffuse osteopenia. (*Id.* at 930, 939.) She was prescribed Topiramate and referred for a botox injection for her headaches, and was also referred to ophthalmology for a detailed exam of vision acuity and field testing. (*Id.* at 945.)

### 3. <u>May 10, 2017 Hearing</u>

On May 10, 2017, Plaintiff and a VE testified at a hearing before the ALJ. (*Id.* at 35-45.) Plaintiff was represented by an attorney. (*Id.* at 35.)

### a. **Plaintiff's Testimony**

Plaintiff testified that she was unable to work because she had a bad knee that popped out on her right leg and had to wear a brace, had arthritis and carpal tunnel, and suffered "bad headaches." (*Id.* at 36.) She could not walk for more than two to three hours before stopping and needing rest, and she had trouble climbing stairs, bending down and picking up objects that weighed more than ten pounds. (*See id* at 36.) She had webbed fingers on her dominant right hand and suffered from depression and anxiety. (*Id.* at 37.) She had anxiety attacks at least once to twice a day that lasted about fifteen minutes that were often associated with stress and being around groups of people. (*Id.* at 37-38.) She had difficulty sleeping because of her depression and was prescribed sleeping pills, had concentration and memory problems, and was up half of the night due to her urinary frequency. (*Id.* at 38.) She cut her hair because she wasn't able to comb it on her own due to the shooting pain in her arm. (*Id.* at 39.) She had debilitating headaches that made her want to

vomit and made her feel like she had the flu. (*Id.* at 40.) The headaches affected her vision, and she wouldn't drive for fear of getting into an accident. (*Id.* at 41.)

        **b.**    **VE's Testimony**

The VE testified that Plaintiff worked as an assembler, DOT 780.684-062 (SVP 2, light). (*Id.* at 43.) In response to questioning by Plaintiff's attorney, the VE testified that a person who could not walk more than two to three hours and required a sit-stand option would not be able to work. (*Id.*) The VE also testified that a right-hand dominant person who could only use her right hand occasionally for handling and fingering would be prevented from doing assembly work. (*Id.*)

        **4.**    <u>**November 7, 2017 Hearing**</u>

On November 7, 2017, Plaintiff and a second impartial VE testified at a supplemental hearing before the ALJ. (*Id.* at 46-68.) Plaintiff was represented by an attorney. (*Id.* at 47.)

        **a.**    **Plaintiff's Testimony**

Plaintiff testified that she had used drugs and alcohol in the past but had not used any since approximately 2005. (*Id.* at 48.) She stopped working at her last job because her knee started "popping out," and when she would bend down she could not get back up. (*Id.* at 49-50.) She also testified that her right hand swelled when she used it repetitively. (*Id.*) She had difficulty with her house keeping job because she had to go up and down stairs and lift chemicals, and the smell of chemicals intensified her headaches. (*Id.* at 50-51.)

Plaintiff was able to cook because she bought pre-made food that she could put in the oven or microwave, but she was unable to open jars. (*Id.* at 51-52.) She did not wear button up shirts, or put her hair in a ponytail because of the difficulty using her hands. (*See id.* at 51.) She was unable to use a computer because of the pain and numbness in her hands caused by repetitive use. (*Id.* at

51-52.) She had headaches everyday that were worsened by the smell of gas or chemicals. (*Id.*) She was prescribed medication that did not work, but at the time of the hearing was on a new medication that provided a little relief. (*Id.* at 53.) Plaintiff was waiting for an appointment to have a botox injection for her headaches. (*Id.* at 53.) She suffered from depression that made her feel physically "sick" and want to stay in bed, and it made her body ache. (*Id.* at 54.) She experienced anxiety attacks at least two to three times a day that made her feel like she couldn't breathe. (*Id.* at 55.) They were unexpected, and she could "never tell when [they were] going to come on." (*Id.*) She also had issues with incontinence, for which she was on medication. (*Id.* at 56.) She estimated that she would use the restroom about seven to eight times during an eight hour day. (*Id.*) She experienced pain in her right rotator cuff and frequently could not extend her arm straight out due to pain. (*Id.* at 57-58.)

### b. VE's Testimony

The second VE testified that Plaintiff worked as an assembler, DOT 780.684-062 (SVP 2, light). (*Id.* at 66.) The VE considered a hypothetical where the individual had socialization issues, was restricted to jobs that didn't require collaborative decision-making or teamwork, and could only engage in superficial interactions at work. (*Id.*) That individual would not be precluded from working as an assembler. (*Id.* at 66-67.) She also testified that if it could be shown that Plaintiff could not use her upper extremity due to shoulder issues or not having good bi-manual dexterity, she would be precluded from performing almost all semi-skilled work. (*See id.* at 67.)

## C. ALJ's Findings

The ALJ issued his decision denying benefits on January 12, 2018. (doc. 15-1 at 19-27.) At step one, he found that Plaintiff had not engaged in substantial gainful activity since June 10, 2014, the alleged onset date. (*Id.* at 21.) At step two, the ALJ found that Plaintiff had the following

severe impairments: pituitary gland disorder status post surgery, degenerative joint disease, depression, and anxiety. (*Id*.)  Despite these impairments, at step three, he found that Plaintiff had no impairments or combination of impairments that met or equaled the severity of one of the impairments listed in the social security regulations.  (*Id.* at 23.)

Next, the ALJ determined that Plaintiff retained the RFC to perform medium work, she could lift and/or carry 50 pounds occasionally, lift and/or carry 25 pounds frequently, stand/walk for six hours in an eight-hour workday, and sit for six hours in an eight-hour workday. (*Id.* at 24.) She could understand, remember and carry out simple instructions, make judgments that were commensurate with the functions of unskilled work, respond appropriately to supervision, co-workers, and usual work situations, and deal with changes in a routine work setting. (*Id.*) She would be limited to engaging in only superficial social interaction in a work setting with no teamwork or collaborative decision-making. (*Id.*) The ALJ found that Plaintiff was capable of performing her past relevant work as an assembler because the work did not require the performance of work-related activities precluded by her RFC. (*Id.* at 26.)  Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined by the Social Security Act, from June 10, 2014, through January 12, 2018.  (*Id.* at 27.)

## II.  STANDARD OF REVIEW

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence.  *Greenspan v. Shalala*, 38 F.3d 232, 236

(5th Cir. 1994); 42 U.S.C. § 405(g), 1383(C)(3).[3]  Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion.  *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995).  In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present.  *Greenspan*, 38 F.3d at 236.  A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision.  *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act.  *Leggett*, 67 F.3d at 563–64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988).  The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1.       An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

---

[3]The scope of judicial review of a decision under either the supplemental security income program or the social security disability program is the same.  *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985).  The relevant law and regulations governing the determination of claims under either program are also identical, so courts may rely on decisions in both areas without distinction in reviewing an ALJ's decision.  *See id.*

2.      An individual who does not have a "severe impairment" will not be found to be disabled.

3.      An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4.      If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5.      If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)).

Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

## III.  ISSUES FOR REVIEW

Plaintiff presents two issues for review:

1.      The ALJ failed to fully and fairly develop the record by not inquiring as to the reasons for [Plaintiff's] non-compliance with treatment.

2. The ALJ erred in failing to consider or evaluate the effect of [Plaintiff's] medically determinable severe impairment of urinary incontinence/ frequency.

(doc. 36 at 4.)

## A. <u>Duty to Develop the Record</u>

Plaintiff argues that the ALJ failed to fully and fairly develop the record by not inquiring as to the reasons for her non-compliance with treatment. (*Id.* at 13.)

An ALJ has a duty to fully and fairly develop the facts relative to a claim for benefits. *Newton v. Apfel*, 209 F.3d 448, 458 (5th Cir. 2000) (citing *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995)). When the ALJ fails in this duty, he does not have before him sufficient facts upon which to make an informed decision, and his decision is not supported by substantial evidence. *Brock v. Chater*, 84 F.3d 726, 728 (5th Cir. 1996) (per curiam) ("When a claimant is not represented by counsel, the ALJ owes a heightened duty to 'scrupulously and conscientiously probe into, inquire of, and explore for all relevant facts.' "); *Kane v. Heckler*, 731 F.2d 1216, 1219 (5th Cir. 1984). For this reason, a reviewing court may reverse the ALJ's decision if the claimant can show that "(1) the ALJ failed to fulfill his duty to develop the record adequately and (2) that failure prejudiced the plaintiff." *Jones v. Astrue*, 691 F.3d 730, 733 (5th Cir. 2012).

### 1. *SSR 16-3p*

Plaintiff argues that the ALJ violated Social Security Regulation (SSR) 16-3p when he failed to consider the possible reasons as to why she was not able to comply with treatment or seek treatment consistent with the degree of her complaints. (doc. 36 at 15.)

SSR 16-3p requires the ALJ to consider a plaintiff's statements about the intensity, persistence, and limiting effects of her symptoms, which the ALJ must then consider in light of the

objective medical evidence and other evidence in the record. *Anderson v. Berryhill*, No. 3:16-CV-0853-BK, 2017 WL 3589543, at *5 (N.D. Tex. Aug. 18, 2017). It provides:

> [I]f the frequency or extent of the treatment sought by an individual is not comparable with the degree of the individual's subjective complaints, or if the individual fails to follow prescribed treatment that might improve symptoms, we may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record. We will not find an individuals symptoms inconsistent with the medical evidence in the record on this basis without considering possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints. We may need to contact the individual regarding the lack of treatment or, at an administrative proceeding, ask why he or she has not complied with or sought treatment in a manner consistent with his or her complaints.

Soc. Sec. Admin., SSR 16–3p, Titles II and XVI: Evaluation of Symptoms in Disability Claims, 2016 WL 1119029 (Mar. 16, 2016).

Here, the ALJ found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms [were] not entirely consistent with the medical evidence and other evidence in the record[.]" (doc. 15-1 at 25.) He found that the record contained significant gaps in her history of treatment and use of pain medications, and did not did not contain additional treatment such as injections or surgical intervention, or "any opinions from treating or examining physicians indicating that the claimant [was] disabled or even [had] limitations greater than those determined in [his] decision." (*Id.* at 25-26.) She did not have a record of frequent hospitalization, emergency room visits, or doctor/clinic treatments. (*Id.* at 26.) After her pituitary adenoma surgery, she reported that she did not have severe headaches, and her pain was a six out on a ten-point scale. (*Id.* at 727. ) She was prescribed Meclizine for dizziness, which helped her feel stable while she was on it. (*See id.* at 727-28,888.) After surgery, Plaintiff noted only occasional right-sided headaches and some concentration/memory difficulties, but otherwise had no specific complaints. (*Id.* at 850-51.)

The doctor's assessment noted that she was symptomatically doing well and had frequent headaches that were not related to her pituitary tumor. (*Id.* at 851.) The ALJ also noted that there was no evidence of "any motor, reflex, sensory, or neurological weakness or atrophy," or any medical signs and findings to support a disabling degree of impairment. (*Id.* at 25.)

Here, the ALJ reviewed the record as a whole, which included Plaintiff's gap in treatment, and detailed the reasons for his conclusion. *See Griego v. Sullivan*, 940 F.2d 942, 945 (5th Cir. 1991) ("An ALJ has discretion to use a plaintiff's noncompliance with treatment in making a determination about Plaintiff's subjective complaints, as long as the ALJ's conclusions are supported by substantial medical evidence."). The ALJ found that Plaintiff's daily activities were not limited to the extent expected, given the complaints of disabling symptoms and limitations. (*Id.* at 26.) She could prepare meals, maintain her own hygiene, drive a vehicle, manage money, and perform household chores. (*Id.* at 26.) The ALJ did not base his finding of not disabled solely on Plaintiff's noncompliance with treatment, but on the record as a whole, considering her noncompliance as a factor. *See Milligan v. Colvin*, No. 3:14-CV-868-L, 2014 WL 7028038, at *8 (N.D. Tex. Dec. 12, 2014) ("To the extent that the ALJ based his decision of non-disability on [the plaintiff's] non-compliance with prescribed treatment, that was but one of many factors-including the objective medical evidence in the record and [the plaintiff's] lack of complaints, lack of shortness of breath, and improvement on medication—that the ALJ cited."). The ALJ specifically noted in his decision that the record indicated that Plaintiff had not taken her medication and followed up with treatment because of loss of insurance coverage. (doc. 15-1 at 22.)

The ALJ's duty to develop the record "is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." *Mayes v.*

*Massanari*, 276 F.3d 453, 459-60 (5th Cir. 2001). Moreover, Plaintiff was represented by counsel at the hearing, so no "heightened duty to scrupulously and conscientiously explore all relevant facts" arose. *Castillo v. Barnhart*, 325 F.3d 550, 552-53 (5th Cir. 2003) (per curiam); *see, e.g., Isbell v. Colvin*, No. 1:14-CV-006-C, 2015 WL 1208122, at *3 n.1 (N.D. Tex. Mar. 16, 2015) (noting that the ALJ did not have a heightened duty to develop the record where the claimant was represented by counsel). Additionally, as noted, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. There is no indication that the ALJ found the evidence in the record inconclusive or otherwise inadequate to render a decision. The ALJ clearly considered the medical records from Plaintiff's examinations that noted the reason for her gap in treatment. (doc. 15-1 at 22.) There is also no evidence that her counsel raised the need for an additional examination into her gap in treatment at the hearing or at any time before the ALJ rendered his decision. *See Busby v. Colvin*, No. CV H-15-2929, 2017 WL 818582, at *10 (S.D. Tex. Feb. 10, 2017), *report and recommendation adopted sub nom. Busby v. Berryhill*, No. CV H-15-2929, 2017 WL 822123 (S.D. Tex. Feb. 28, 2017) (The ALJ did not err by considering noncompliance with treatment and noted that the Plaintiff never provided the ALJ with an explanation why he was not in compliance). Accordingly, the ALJ did not have a duty to further develop the record by inquiring into the reason for Plaintiff's gap in treatment, and remand is not required on this issue.

    *2. SSR 82-59*

    Plaintiff argues the requirements of SSR 82-59 apply because the ALJ's ultimate finding was based "significantly on the ALJ's perception that [Plaintiff's] failure to follow a prescribed treatment caused the condition to be worse than it might otherwise be." (doc. 36 at 20.)

    Under SSR 82-59, "[a]n individual who would otherwise be found under a disability, but

who fails without justifiable cause to follow treatment prescribed by a treating source which the Social Security Administration (SSA) determines can be expected to restore the individual's ability to work, cannot by virtue of such 'failure' be found to be under a disability." Titles II & Xvi: Failure to Follow Prescribed Treatment, SSR 82-59, 1982 WL 313 84 (S.S.A. 1982). Failure to follow prescribed treatment is an issue "only where all of the following conditions exist":

> 1. The evidence establishes that the individual's impairment precludes engaging in any substantial gainful activity (SGA) or, in the case of a disabled widow(er) that the impairment meets or equals the Listing of Impairments in Appendix 1 of Regulations No. 4, Subpart P; and

> 2. The impairment has lasted or is expected to last for 12 continuous months from onset of disability or is expected to result in death;

> 3. Treatment which is clearly expected to restore capacity to engage in any SGA (or gainful activity, as appropriate) has been prescribed by a treating source; and

> 4. The evidence of record discloses that there has been refusal to follow prescribed treatment.

*Id.* The ALJ must adhere to the policy issued in SSR 82-59 if he relied almost exclusively on noncompliance with prescribed treatment to determine Plaintiff's RFC. *Compare Lindsey v. Astrue*, No. 3:09-CV-1649-BF, 2011 WL 817173, at *8 (N.D. Tex. March 9, 2011) ("[T]he ALJ cannot circumvent the requirements of SSR 82–59 and §§ 404.1535 and 416.935 by couching her analysis of substance use and noncompliance in terms of an RFC determination."), *with Johnson v. Comm'r of Soc. Sec. Admin.*, No. 3:11-CV-3126-L-BF, 2013 WL 632104, at *21 (N.D. Tex. Feb. 4, 2013) ("The ALJ merely utilized Plaintiff's noncompliance with prescribed treatment as a factor in assessing her credibility.").

Here, the ALJ determined that Plaintiff did not suffer from a disabling impairment and was not disabled. Her noncompliance with prescribed treatment was one of many factors in his analysis.

He also considered the gaps in Plaintiff's treatment and her ability to drive, cook, clean and maintain her own personal hygiene. He pointed to medical evidence in the record detailing improvements in her symptoms, her lack of additional treatment such as injections or surgical intervention, and the absence of any medical notes or reports documenting significantly decreased range of motion, muscle weakness or atrophy.

Because the ALJ found Plaintiff was not disabled and did not rely solely on her gap in treatment and noncompliance for his decision, the requirements of SSR 82-59 did not apply. Accordingly, the ALJ did not have a duty to further develop the record by inquiring into the reason for Plaintiff's gap in treatment, and remand is not required on this issue.

## D.  Incontinence

Plaintiff argues that the ALJ erred in failing to consider or evaluate the effect of her medically determinable severe impairment of urinary incontinence/frequency. (doc. 36 at 21.)  The Commissioner responds that objective medical evidence supports the ALJ's finding that Plaintiff's urinary incontinence was not severe. (doc. 37 at 7.)  He contends that Plaintiff did not list incontinence as a disabling condition at the time she filed her application for SSI and DIB, and that she did not testify that incontinence was a reason for her inability to work.  (*Id.* at 7-8.)  He also points to her testimony that her symptoms had improved because of her medication and argues that there was no evidence supporting a finding of severe incontinence because Plaintiff was not limited in her daily activities. (*Id.* at 8.)

At step two of the sequential evaluation process, the ALJ "must consider the medical severity of [the claimant's] impairments."  20 C.F.R. § 404.1520(a)(4)(ii), (c).  To comply with this regulation, the ALJ "must determine whether any identified impairments are 'severe' or 'not

severe.'" *Herrera v. Comm'r of Soc. Sec.*, 406 F. App'x 899, 903 (5th Cir. 2010). Under the Commissioner's regulations, a severe impairment is "any impairment or combination of impairments which significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). The Fifth Circuit has held that a literal application of this regulation would be inconsistent with the Social Security Act because the regulation includes fewer conditions than indicated by the statute. *Stone v. Heckler*, 752 F.2d 1099, 1104–05 (5th Cir. 1985). Accordingly, in the Fifth Circuit, an impairment is not severe "only if it is a slight abnormality having such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work." *Id.* at 1101. In other words, "the claimant [need only] make a de minimis showing that her impairment is severe enough to interfere with her ability to do work." *Anthony v. Sullivan*, 954 F.2d 289, 294 n.5 (5th Cir. 1992) (citation omitted). When determining whether a claimant's impairments are severe, an ALJ is required to consider the combined effects of all physical and mental impairments regardless of whether any impairment, considered alone, would be of sufficient severity. *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000) (citing 20 C.F.R. § 404.1523). The claimant has the burden to establish that her impairments are severe. *See Bowen v. Yukert*, 482 U.S. 137, 146 n.5 (1987).

Here, the ALJ failed to discuss Plaintiff's incontinence at all, although she repeatedly reported urinary incontinence to her physicians. The Fifth Circuit has held that "incontinence may be an impairment for purposes of the Social Security Act and must be considered by the Commissioner in determining whether a claimant is disabled." *Crowley v. Apfel*, 197 F.3d 194, 198 (5th Cir.1999); *see also Reese v. Astrue*, No. CIV.A 08–1423, 2010 WL 439528, at *4 (W.D.La. Feb.4, 2010); *March v. Comm'r of Soc. Sec. Admin.*, 559 F.Supp.2d 722, 731 (N.D.Tex.2008).

According to the record, Plaintiff had persistent issues with urinary frequency, incomplete emptying, urinary leaking, groin pain, and blood in her urine. (doc. 15-1 at 55-56, 549, 554.) She wore two to three pantiliners a day to prevent accidents. (*See id.* at 417.) Although she indicated that the medication she was taking helped because "even when she [felt] the urge to go to the bathroom she [did] not leak, " she reported going to the restroom approximately 20 - 25 times. (*Id.* at 574, 769.) During her May 10, 2017 testimony, she testified that she was up about half of the night going to the restroom, but it was "better during the day because of [her] intake[.]" (*Id.* at 38.) She also testified that she would use the restroom seven or eight times within an eight hour day. (*Id.* at 56.) Plaintiff's subjective complaints are reasonably consistent with the objective evidence provided in the record. *See Adams v. Bowen*, 833 F.2d 509, 512 (5th Cir.1987) (subjective complaints must be reasonably consistent with the objective evidence provided in the record); *cf. Herrera v. Colvin*, No. 4:11-CV-881-BJ, 2013 WL 1286647, at *7 (N.D. Tex. Mar. 28, 2013) ("With the paucity of evidence relating to [the plaintiff's] incontinence and its alleged limitations, the Court concludes that the ALJ's decision is supported by substantial evidence and, thus, that the ALJ did not err by omitting [the plaintiff's] urinary incontinence from his list of severe impairments.").

The ALJ was required to consider all impairments, including those that are not severe, in making an RFC determination. *Giles v. Astrue*, 433 F. App'x 241, 245 (5th Cir. 2011); *see also Ong v. Saul*, No. 4:18-CV-3577, 2020 WL 164559, at *2 (S.D. Tex. Jan. 13, 2020). The failure to determine the severity of Plaintiff's incontinence at step two as required by 20 C.F.R. § 404.1520(a)(4)(ii),(c) was legal error. *See McNair v. Comm'r of Soc. Sec. Admin.*, 537 F. Supp. 2d 823, 838 (N.D. Tex. 2008) (explaining that violation of a regulation constitutes legal error).

Nevertheless, where the ALJ fails to specifically determine the severity of a claimant's

impairments at step two, remand is not required if the ALJ proceeds to the remaining steps of the disability analysis and considers the alleged impairment's — or its symptom's — effects on the claimant's ability to work at those steps.  *See, e.g.*, *Herrera*, 406 F. App'x at 3 and n.2 ; *Abra v. Colvin*, No. 3:12-CV-1632-BN, 2013 WL 5178151, at *4 (N.D. Tex. Sept. 16, 2013) (listing cases). This approach is consistent with cases holding that an ALJ's failure to apply the correct standard at step two in determining the severity of the claimant's impairments "does not mandate automatic reversal and remand, and application of harmless error analysis is appropriate [] where the ALJ proceeds past step two in the sequential evaluation process." *Gibbons v. Colvin*, No. 3:12-CV-0427-BH, 2013 WL 1293902, at *14 (N.D. Tex. Mar. 30, 2013) (citing cases); *Norris v. Berryhill*, No. 3:15-CV-3634-BH, 2017 WL 1078524, at *13 (N.D. Tex. Mar. 22, 2017) (finding that even if the ALJ erred in failing to explain why he found only certain impairments to be severe, the error was harmless where he proceeded with the sequential evaluation process).  Accordingly, to obtain remand, Plaintiff must show that the ALJ's step two error was not harmless.  *See Garcia v. Astrue*, No. CIV. —08-264, 2012 WL 13716, at *12 (S.D. Tex. Jan. 3, 2012) ("Assuming . . . that the ALJ erred in failing to specifically address whether Plaintiff's right leg venous thrombosis was a severe impairment, the next question is whether the ALJ committed reversible error.").

**E.**   <u>**Harmless Error**</u>

Plaintiff argues that the ALJ's error was not harmless because the ALJ's decision might have been different if he had considered her urinary incontinence. (doc. 36 at 24.)

The Fifth Circuit has held that "[p]rocedural perfection in administrative proceedings is not required," and a court "will not vacate a judgment unless the substantial rights of a party are affected." *Mays v. Bowen*, 837 F.2d 1362, 1363–64 (5th Cir. 1988). "[E]rrors are considered

prejudicial when they cast doubt onto the existence of substantial evidence in support of the ALJ's decision." *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988). In the Fifth Circuit, harmless error exists when it is inconceivable that a different administrative conclusion would have been reached absent the error. *Bornette v. Barnhart*, 466 F. Supp. 2d 811, 816 (E.D. Tex. Nov. 28, 2006) (citing *Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003)). Accordingly, to establish prejudice that warrants remand, Plaintiff must show that the ALJ's decision might have been different had he properly considered her well-documented urinary incontinence in her RFC. *See id.* at 816 (*citing Newton*, 209 F.3d at 458).

Residual functional capacity, or RFC, is defined as the most that a person can still do despite recognized limitations. 20 C.F.R. § 404.1545(a)(1). The RFC determination is a combined "medical assessment of an applicant's impairments with descriptions by physicians, the applicant, or others of any limitations on the applicant's ability to work." *Hollis v. Bowen*, 837 F.2d 1378, 1386-87 (5th Cir. 1988) (per curiam). It "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." Social Security Ruling (SSR) 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996). An individual's RFC should be based on all of the relevant evidence in the case record, including opinions submitted by treating physicians or other acceptable medical sources. 20 C.F.R. § 404.1545(a)(3); SSR 96-8p, 1996 WL 374184, at *1.

The ALJ "is responsible for assessing the medical evidence and determining the claimant's [RFC]." *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985). The ALJ may find that a claimant has no limitation or restriction as to a functional capacity when there is no allegation of a physical or mental limitation or restriction regarding that capacity, and no information in the record indicates

that such a limitation or restriction exists. *See* SSR 96-8p, 1996 WL 374184, at *1. The ALJ's RFC decision can be supported by substantial evidence even if he does not specifically discuss all the evidence that supports his decision or all the evidence that he rejected. *Falco v. Shalala*, 27 F.3d 160, 163-64 (5th Cir. 1994). A reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the court would reach a different conclusion based on the evidence in the record. *Leggett*, 67 F.3d at 564. Nevertheless, the substantial evidence review is not an uncritical "rubber stamp" and requires "more than a search for evidence supporting the [Commissioner's] findings." *Martin v. Heckler*, 748 F.2d 1027, 1031 (5th Cir. 1984) (citations omitted). The Court "must scrutinize the record and take into account whatever fairly detracts from the substantiality of the evidence supporting the" ALJ's decision. *Id.* Courts may not reweigh the evidence or substitute their judgment for that of the Secretary, however, and a "no substantial evidence" finding is appropriate only if there is a "conspicuous absence of credible choices" or "no contrary medical evidence." *See Johnson*, 864 F.2d at 343 (citations omitted).

The ALJ's RFC discussion did not address or mention Plaintiff's urinary incontinence. She testified that her issues with incontinence were constant. (doc. 15-1 at 55.) Although she was on medication, it was only prescribed for use at night, and she needed to use the restroom approximately seven to eight times in an eight hour day. (*Id.* at 56.) Treatment notes reflected that Plaintiff had issues with frequent urination, urinary leakage, blood in her urine, pelvic pain, and right lower quad pain that radiated to her right groin and was diagnosed with mixed urinary incontinence. (*Id.* at 417, 554, 574, 743, 770.) The ALJ did not discuss or acknowledge Plaintiff's testimony or the treatment notes regarding her complaints of urinary incontinence. Consequently, the ALJ did not consider or incorporate any limitations into Plaintiff's RFC to accommodate for

additional restroom breaks to account for Plaintiff's urinary frequency. Because the ALJ did not reference this evidence in assessing Plaintiff's RFC, it is unclear whether he accounted for the effects of her urinary incontinence on her ability to perform work-related functions as required by the regulations. *See* 20 C.F.R. § 404.1545(a)(1)-(3). Consequently, it is unclear whether he considered the effects that this impairment may have on her ability to work at step five.[4]

Here, Plaintiff has met her burden to show that given the evidence supporting her complaints of urinary frequency, the ALJ could have reached a different disability determination had he included its effects on her ability to work and incorporated relevant limitations into her RFC. *See Mac v. Sullivan*, 811 F. Supp. 194, 199 (E.D. Pa. 1993) (explaining "that [a] necessity to leave the work station regularly due to incontinence could significantly affect a claimant's ability to meet job demands, even for a claimant of unimpaired physical strength, and thus reduce the number of jobs available to that claimant") (citation omitted). Because it is not inconceivable that the ALJ would have reached a different determination at step five absent his step-two error, the error was not harmless. *See Corbitt v. Comm'r of Soc. Sec. Admin.*, No. 3:10-CV-558-CWR-LRA, 2013 WL 603896, at *5-6 (S.D. Miss. Feb. 19, 2013) (remanding where the "ALJ's decision show[ed] that he did not seriously consider the specific problems" that the claimant's "diabetes create[d]" either at step two or "in the remainder of the five-step evaluation process to justify a finding of harmless error"); *compare to Adams v. Bowen*, 833 F.2d 509, 512 (5th Cir. 1987) (finding "no ground" for remand where "the ALJ acknowledged" the claimant's alleged "significant impairment" at step two

---

[4] It is also unclear whether the RFC was supposed to include additional limitations to account for the impairments related to cervical radiculopathy. Later in the decision, he stated that he limited Plaintiff's "handling and fingering in light of his degenerative cervical disease," but the RFC did not include any manipulative limitations. (*See* doc. 11-1 at 39.) Nevertheless, an ALJ's decision "must stand or fall with the reasons set forth in [his] decision, as adopted by the Appeals Council," however. *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000).

but found it to be non-severe, and "went on to find, pursuant to the fourth step of the sequential evaluation analysis, that [the] impairment did not disable [her] from performing her past sedentary work"); *Boothe v. Colvin*, No. 3:12-CV-5127-D, 2013 WL 3809689, at * 5-6 (N.D. Tex. July 23, 2013) , at *5 (finding that any step-two error was "harmless because the ALJ considered [the alleged] conditions in his RFC analysis"). Accordingly, remand is appropriate on this basis.

## IV.  CONCLUSION

The Commissioner's decision is **REVERSED**, and the case is **REMANDED** to the Commissioner for further proceedings.

**SO ORDERED**, on this 26th day of March, 2020.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE